UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

JOHN WILCOX,

      Plaintiff,

v.                                                    Civ. No. 19-296 KWR/GJF

MANAGEMENT AND TRAINING
CORPORATION, WARDEN R.
MARTINEZ, DOES 1-10, SERGEANT
ALAYA, EBETH MARTINEZ-CRUZ,
and DEPUTY WARDEN SIMMONS, *all
in their official and individual capacities*,

      Defendants.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION
REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment. ECF 45 (Motion); *see also* ECFs 48-49 (Response), 50 (Reply). The Motion presents the question of whether Defendants violated Plaintiff's First and Fourteenth Amendment rights when they denied him a book that was mailed to his prison address from what was in 2016 a non-approved source. For the reasons set forth below, the Court concludes that Defendants did not violate Plaintiff's constitutional rights. The Court therefore recommends **GRANTING** the Motion and **DISMISSING** Plaintiff's Amended Complaint [ECF 22] and this case **WITH PREJUDICE**.[1]

**I.   BACKGROUND**[2]

In April 2016, Plaintiff was incarcerated in the Otero County Prison Facility (OCPF). Mot. ¶ 9; ECFs 47 at 1; 48 at ¶ 2. He was the intended recipient of a paperback book entitled *Prisoners'*

---

[1] The Court files this recommendation pursuant to the presiding judge's Order of Reference Relating to Bankruptcy Appeals, Social Security Appeals, Prisoner Cases, and Immigration Habeas Corpus Proceedings. ECF 27.

[2] The operative facts set forth in this section (Section I) are either (1) affirmatively admitted by the opposing party or (2) not "specifically controverted" by the opposing party. D.N.M.LR-Civ. 56.1. Sections II and III address several

*Guerrilla Handbook to Correspondence Programs in the United States and Canada* (3rd ed.), mailed to him by the book's publisher, Prison Legal News.  Mot. ¶¶ 7, 9; ECFs 47 at 1; 48 at ¶¶ 2, 5; 49 at 1-2, 10-11.  But "[i]n 2016, and prior thereto, to alleviate [various] security concerns, OCPF only allowed [softbound] books [and magazines and newspapers] that were mailed directly from" an "approved vendor list"—an "extensive list … [that] provided over a million book titles."  Mot. ¶¶ 1-2, 5-6, 10, 13-15, 18-27 (citing, *inter alia*, ECF 43-9 (OCPF's list of approved book vendors, which includes "Barnes and Noble" and "Amazon" but not Prison Legal News)); *see* ECFs 47 at 7; 48 at 1, 5; 49 at 1-2.  Consequently, because the book was mailed from a non-approved vendor (Prison Legal News), OCPF officials did not allow Plaintiff to receive or possess the book.  Mot. ¶¶ 9, 15, 34; ECFs 47 at 1; 48 at 1; 49 at 10-11.

Instead, OCPF officials formally notified Plaintiff that he had two options: either (1) "send out [his] book to any outside address at [his] cost" or (2) "donate the book to [the] law library and have access to it when law library is requested."  Mot. ¶ 34; ECF 49 at 10.  And "if neither of [these] options [were] chosen" within 14 days, the book would be destroyed.  Mot. ¶ 34; ECF 49 at 10.  Plaintiff declined to choose either option.  Mot. ¶ 35; ECF 49 at 10.  Instead of destroying the book, however, OCPF officials "placed [the book] in the OCPF library where [Plaintiff] has access to it."  Mot. ¶ 35; ECF 49 at 11.[3]  In September 2021, Plaintiff represented that he has been "unaware" that the book was placed in OCPF's library—or that it had been in the prison library system for at least five years.  ECF 49 at 10-11.  Furthermore, the record contains no evidence that

additional facts.  Any disputes of fact not addressed in Sections I through III are disputes that the Court considers immaterial.

[3] Plaintiff notes that, in November 2016, he was transferred to a different prison in New Mexico.  ECF 49 at 11; *see also* ECFs 1, 24, 36 (containing Plaintiff's updated addresses).  But Plaintiff makes no representation—and presents no evidence—that he has been unable to access this book through the prison's free inter-library loan system.  *See* ECFs 47-49; Mot. ¶¶ 29, 33.

Plaintiff ever attempted to access this book via the means that were authorized in early 2016—including (1) OCPF's "traditional library [or] law library," Mot. ¶¶ 28-32; (2) the free "inter-library loan system," which allows inmates to "request a book [from another prison library] if OCPF does not have it" in its library of over 19,000 books, Mot. ¶¶ 29, 33; or (3) an "approved vendor," Mot. ¶ 14. *See* Mot.; ECFs 43-44, 47-49.[4]

Plaintiff nevertheless "pursued both the informal complaint process and the formal grievance process." Mot. ¶¶ 36-39; ECFs 48 at ¶ 4; 49 at 3-10. In doing so, Plaintiff complained that OCPF violated his First Amendment rights by denying him the opportunity to possess, as his personal inmate property, this book that had arrived from a non-approved vendor. ECFs 22 at 11, 38-39; 48 at ¶¶ 3-5; 49 at 3-4. Prison personnel denied Plaintiff's grievance and, nearly three years later, Plaintiff filed suit in this Court in April 2019. Mot. ¶ 39; ECFs 1; 49 at 3-6.

## II. PLAINTIFF'S AMENDED COMPLAINT

Plaintiff alleges in his Amended Complaint [ECF 22] that Defendants, in their individual and official capacities, violated his First and Fourteenth Amendment rights and are therefore liable for monetary damages pursuant to 42 U.S.C. § 1983. Am. Compl. [ECF 22] 1-4, 9.[5] Specifically, he alleges that Defendants violated his First Amendment rights when they prohibited him from having a book that a non-approved vendor sent to him. *Id.* at 18-20, 26. In addition, he asserts

---

[4] "After October, 2016, OCPF maintained its approved vendor list but also allowed items to be provided by publishers." Mot. ¶¶ 11-12, 15. And "[s]ince approximately July 2017, OCPF requires softbound books … [to] be received 'directly from the publisher or vendor' and … no longer uses an approved vendor list." *Id.* at ¶ 17. The record also contains no evidence that, after October 2016, Plaintiff ever again attempted to obtain his own personal copy of this book from the publisher. *See* ECFs 47-19; *see also* ECF 22 at 37 (the April 2016 sales receipt, attached to Plaintiff's Complaint, showing that the publisher charged Plaintiff $0.00 for the "complimentary" book).

[5] The Court previously dismissed the original complaint [ECF 1] without prejudice because it "fail[ed] to state a cognizable First Amendment claim." ECF 18 at 5-6; *see also* ECF 1 at 3 (original complaint alleging only a First Amendment violation). The Court, however, found that the Amended Complaint passed initial review under 28 U.S.C. § 1915(e) (except with respect to one named Defendant whom the Court dismissed with prejudice), and the Court therefore allowed the case to move forward. ECF 26; *see also* ECF 31 (subsequently adding Deputy Warden Simmons as a Defendant).

that Defendants violated his Fourteenth Amendment due process rights by not following the required procedures for depriving him of his personal property.  *Id.* at 21-23, 26, 28-29, 31-32, 35. Lastly, he claims that Defendants violated his Fourteenth Amendment equal protection rights by treating him differently than other similarly situated inmates, particularly by allowing other inmates to receive books from non-approved vendors.  *Id.* at 24, 26-27, 30, 35; *see also* ECFs 47 at 9; 48 at 2; 49 at 14.

## III. PARTIES' PRIMARY ARGUMENTS

### A. Defendants' Contentions

In August 2021, after complying with the Court's Order to File a *Martinez* Report, *see* ECFs 38, 43-44, 47, Defendants filed the instant Motion.  Mot. 10-25.  Defendants contend that "there is no genuine issue of material fact and [they are] entitled to judgment as a matter of law" on all of Plaintiff's claims and that the "Amended Complaint should [thus] be dismissed, with prejudice."  *Id.* at 1-3, 10, 25.

As to Plaintiff's First Amendment claims, Defendants argue that there is no genuine factual dispute that their approved vendor policy was reasonably related to the "legitimate penological interest of security and resource management."  *Id.* at 10-22.  In support of this argument, Defendants present an affidavit from Warden Martinez [ECF 43-1] that attests to the following:

> (1) the policy's purpose, and its effect, was to efficiently alleviate security concerns regarding "the smuggling of contraband from the outside"—including "concern[s] that a 'publisher' was not legitimate and was a front for sending contraband," Mot. ¶¶ 10, 13, 18, 23, 25-16, 26-27 (quoting affidavit);[6]

---

[6] Warden Martinez's affidavit further notes that "[b]ooks, *including paperback books*, mailed to an inmate present a security risk for the smuggling of contraband such as needles, drugs[,] weapons, . . . . sexually explicit content[,] material that may support or induce violence, as well as information that could assist an inmate with escape, … banned substance manufacturing and trafficking, and/or … other activities which may threaten security and safety at OCPF." *Id.* at ¶ 10 (emphasis added) (quoting affidavit); *see also* ¶ 23 (quoting affidavit's statement that the pages of books can be laced or soaked "with drugs like ketamine and suboxone" or used to "send coded messages").

(2) the policy was an effective use of "OCPF's limited resources," ¶¶ 19-22, 27 (quoting affidavit);[7] and

(3) the policy still permitted inmates to access a broad range of publications, particularly from OCPF's libraries, the inter-library loan system, and "OCPF's extensive list of approved vendors, which provided over a million book titles," ¶¶ 14, 28-32 (quoting affidavit).

*See also* Mot. 3-9 (incorporating content from this affidavit into Defendants' statement of material facts); ECF 43-1 at 1 (Warden Martinez stating that he has been the "Warden at [OCPF] since August 2015" and that the facts set forth in his affidavit are "based upon [his] own personal knowledge").

As to Plaintiff's Fourteenth Amendment due process claim, Defendants assert that there is no genuine factual dispute that Plaintiff was given an opportunity "to be heard" before prison officials deprived him of his property interest in the book. *Id.* at 22-25. In support of this assertion, Defendants present evidence that they (1) gave Plaintiff the opportunity to send his book to a place of his choosing and (2) placed the book in the library when Plaintiff failed to dictate where the book should go. *Id.* at ¶¶ 34-35 (citing Martinez affidavit and the notification sent to Plaintiff informing him of his options concerning the book).

As to Plaintiff's Fourteenth Amendment equal protection claim, Defendants contend that there is no genuine factual dispute that Plaintiff was "treated the same as all other similarly situated state inmates." *Id.* at 22-25. To support this contention, Defendants present evidence from Warden Martinez's affidavit that Plaintiff was "treated the same as any other inmate at OCPF with respect to the application of [their approved vendor policy]." *Id.* at ¶ 40 (quoting Martinez affidavit).

---

[7] Warden Martinez's affidavit states that allowing non-approved vendors to ship books to inmates would have led to an "increased administrative burden involved in checking each book for contraband"—and that in 2016 such additional security measures would have been "an unjustified burden on OCPF's limited resources," including by creating "the need to hire additional staff or purchase additional screening equipment such as metal/drug detectors," and "ma[king] it difficult if not impossible to comply with [the required] time constraints" for holding inmates' mail and packages. ¶¶ 19-22, 27 (quoting affidavit).

### B.  Plaintiff's Response

Regarding the First Amendment claims, Plaintiff does not specifically controvert Defendants' evidence that their approved vendor policy (1) alleviated security concerns regarding the smuggling of contraband, (2) was an effective use of limited prison resources, and (3) still permitted access to a broad range of publications.  *Compare supra* Section III(A) (summarizing the representation in Warden Martinez's regarding the approved vendor policy), *with* ECFs 47-49 (containing no specific refutations of such evidence).  Instead, Plaintiff appears to argue that he has a First Amendment right to personally possess paperback books that are shipped from non-approved vendors.  *See* ECFs 48 at ¶ 3; 49 at 1-3, 12-14.

Regarding the due process claim, Plaintiff does not specifically controvert Defendants' evidence that they (1) gave Plaintiff an opportunity to send his book to a place of his choosing and (2) placed the book in the library when he failed to dictate where it should go.  *Compare*  ¶¶ 34-35 (citing to Defendants' evidence), *with* ECFs 47-49 (containing no specific refutations of such evidence).  Plaintiff instead contends that Defendants violated his due process rights by not forwarding his grievance appeal to the "Cabinet Secretary/Designee."  ECFs 48 at ¶ 5; 49 at 3-4, 6-10.

Regarding the equal protection claim, Plaintiff asserts that Defendants "treated [Plaintiff] differently than other inmates similarly situated" because they "allowed other inmates to receive book orders from publishers/vendors that were not on OCPF's approved vendor list, including [Prison Legal News]."  ECFs 47 at 9; 48 at 2; 49 at 14.  In support of this argument, Plaintiff presents a printout of an online order confirmation from Prison Legal News.  ECF 47 at 22.  The printout represents that on January 30, 2016, this vendor received $23.99 for a book order ($17.99 for the book and $6.00 for shipping) from an unidentified individual (or perhaps an organization).

*Id.* The printout displays a "status" of "payed [sic], *awaiting shipping*," along with a "ship to:" address of another inmate at OCPF. *Id.* (emphasis added). Plaintiff then states that the inmate identified on this printout "received this book … at [OCPF] … without rejection." ECF 47 at 9.

## IV. APPLICABLE LEGAL STANDARDS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when it "might affect the outcome of the suit under the governing [substantive] law," and a dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." *Id.* (quotations omitted). In other words, "the party opposing summary judgment must 'designate *specific* facts showing that there is a genuine issue for trial.'" *Janny v. Gamez*, 8 F.4th 883, 899 (10th Cir. 2021) (emphasis in original) (quoting *Celotex*, 477 U.S. at 324 (1986); Fed. R. Civ. P. 56(e)); *see also id.* (observing that "the nonmovant must ensure that the factual dispute is portrayed with particularity" (quotation omitted)). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party*, 506 F.3d at 1309. Furthermore, such "affidavits or declarations used

to oppose summary judgment [must] 'set out facts that would be admissible in evidence.'" *Janny*, 8 F.4th at 900 (quoting Fed. R. Civ. P. 56(c)).[8]  Consistent with these principles, all "material facts set forth in the [summary judgment motion] will be deemed undisputed unless *specifically controverted*."  D.N.M.LR-Civ. 56.1(b) (emphasis added).[9]

"A 'judge's function' in evaluating a motion for summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Salazar-Limon v. City of Houston*, 137 S. Ct. 1277, 1280 (2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 249 (1986)); *see also First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U. S. 253, 289 (1968) (the question at summary judgment is whether a jury should "resolve the parties' differing versions of the truth at trial").  In evaluating such a motion, the Court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the … motion.'" *Scott v. Harris*, 550 U. S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U. S. 654, 655 (1962)).

---

[8] *See also id.* at 899-900 (observing that "an affidavit or declaration used to oppose summary judgment must be made on personal knowledge" and "set forth facts, not conclusory statements" (quotations omitted)); *Standish v. Jackson Hole Mt. Resort Corp.*, 997 F.3d 1095, 1107 (10th Cir. 2021) (acknowledging that (1) "a district court may consider only admissible *evidence* from a record in ruling on a motion for summary judgment" and (2) in "review[ing] a district court's findings of law and entry of summary judgment de novo," the Tenth Circuit similarly "consider[s] only admissible evidence" (emphasis in original)).

[9] *See also id.* (further providing that "[e]ach fact in dispute must be **numbered**, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the **number** of the movant's fact that is disputed" (emphasis in original)); *Davis v. Kansas Dep't of Corr.*, 507 F.3d 1246, 1247 n.1 (10th Cir. 2007) (observing that "[o]n account of [inmates'] pro se status, we liberally construe [their] filings, but hold [them] to the same rules of procedure as other litigants").

### B.  Liability under § 1983

Under 42 U.S.C. § 1983 (Civil Action for Deprivation of Rights), any "person" acting under color of state law who "subjects … [another] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."[10]

#### 1.  Individual Liability

A "§ 1983 defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability." *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011).  To be liable, an individual must "ha[ve] been *personally involved* in the underlying violations through their own participation or supervisory control." *Moya v. Garcia*, 895 F.3d 1229, 1232-33 (10th Cir. 2018) (emphasis added).  In addition to personal involvement, an individual sued under a "theory of supervisory liability" must have also "[1] 'promulgated, created, implemented or possessed responsibility for the continued operation of a policy that … caused the complained of constitutional harm' and [2] 'acted with the state of mind required to establish the alleged constitutional deprivation.'" *Id.* at 1233 (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)).[11]

---

[10] Although "[t]he text of § 1983 does not contain a statute of limitations," the limitations period "for § 1983 claims arising in New Mexico" is "three years, as provided in New Mexico's statute of limitations for personal-injury claims." *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1212 (10th Cir. 2014) (citing *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985); N.M. Stat. Ann. § 37-1-8).

[11] All officials sued in their *individual capacity*—whether they are sued under a theory of personal or supervisory liability—"enjoy qualified immunity when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 1232 (quoting *Cordova v. City of Albuquerque*, 816 F.3d 645, 655 (10th Cir. 2016)); *Dodds*, 614 F.3d at 1191-92, 1206-07; *see also Mitchell v. Forsyth*, 472 U.S. 511, 556 n.10 (1985) (observing that "an official sued in his *official capacity* may not take advantage of a qualified immunity defense" (emphasis added)).  The Court, however, need not address whether certain Defendants (in certain capacities) are also entitled to qualified immunity, as Defendants' Motion does not raise this issue.  *See* Mot; *Greer v. Dowling*, 947 F.3d 1297, 1303 (10th Cir. 2020) (observing that "qualified immunity is an affirmative defense that defendants must invoke in district court"); *see also Herrera v. Santa Fe Pub. Schs*, No. CIV 11-0422 JB/KBM, 41 F. Supp. 3d 1027, 1099, 1177-87 (D.N.M. Aug. 29, 2014) (observing that, although "local governments are not entitled to qualified immunity," a private entity defendant may nevertheless be "permit[ted] … to *assert* a qualified immunity defense" when that entity has "acted under close official supervision" (emphasis added)).

2. <u>Private Entity Liability</u>

Additional "persons to whom § 1983 applies" include "municipalities and other local government units," *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690 (1978)—as well as "private defendants fulfilling a government function." *McGee v. Corizon*, 831 Fed. Appx. 381, 384 (10th Cir. 2020) (unpublished) (citing *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1215-16 (10th Cir. 2003)); *see also Dubbs*, 336 F.3d at 1216 (applying § 1983 to "private entities acting under color of state law"). Nevertheless, "[i]t is well established that in a § 1983 case" such public or private entities "cannot be subject to liability at all unless the harm was caused in the implementation of 'official … policy.'" *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1952 (2018) (quoting *Monell*, 436 U.S. at 691); *see also McGee*, 831 Fed. Appx. at 384 (observing that "the *Monell* doctrine—requiring an official policy to be the moving force behind a constitutional violation— applies to private [entities]" (citation omitted)).[12]  Thus, such entities "cannot be held liable … solely because [they] employ[] a tortfeasor"—as § 1983 does not "apply[] agency-based principles of *respondeat superior*" or otherwise "impose liability vicariously." *L.A. County v. Humphries*, 562 U.S. 29, 35-38 (2010) (quoting *Monell*, 436 U.S. at 691).

To establish § 1983 liability for such entities, "a plaintiff must show 1) the existence of a … policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Jensen v. West Jordan City*, 968 F.3d 1187, 1204 (10th Cir. 2020) (quoting *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010)). In other words, there must have

---

[12] The Court notes that Plaintiff's Amended Complaint is brought against all Defendants in both their *personal* and *official* capacity. *See* Am. Compl. 2-3. But to the extent Defendants are sued in their *official* capacity, such allegations "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky. v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell*, 436 U.S. at 690, n. 55). Consequently, such suits should "be treated as a suit against the *entity*," provided it "receives notice and an opportunity to respond." *Id.* (emphasis added). In contrast, "[p]ersonal-capacity suits seek to impose *personal* liability upon a government official for actions he takes under color of state law." *Id.* (emphasis added); *supra* IV(B)(1).

been "a direct causal link between [an entity's policy-based or custom-based] action and the *deprivation of federal rights*." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (emphasis added) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)); *see also Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (noting that "a municipality may not be held liable where there was no underlying constitutional violation by any of its officers").

### C.  First Amendment Right to Receive Information While in Prison

"The First Amendment prohibits laws 'abridging the freedom of speech,' which, 'as a general matter … means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 121 (2011) (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002)).  "[S]entenced prisoners enjoy [this] freedom of speech"—"subject to restrictions and limitations" in light of the "considerations underlying our penal system." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979) (quotation omitted).[13]  For instance, "[i]nmates have a First Amendment right to receive information while in prison"—but only "to the extent the right is not inconsistent with prisoner status or the legitimate penological objectives of the prison." *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004).  More specifically, "when a prison regulation impinges on inmates' constitutional right[]" to receive information, "the regulation is valid if it is *reasonably related* to

---

[13] Some considerations underlying our penal system that courts have "continually recognized" include "(1) the difficulty of running a prison, (2) the separation of powers concerns when a federal court assumes a function (prison administration) entrusted to the legislative and executive branches, and (3) the need for federal courts to accord deference to state prison authorities." *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004).  And because "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," "prisoners' rights may be restricted in ways that 'would raise grave First Amendment concerns outside the prison context.'" *Gee v. Pacheco*, 627 F.3d 1178, 1187 (10th Cir. 2010) (quoting *Turner v. Safley*, 482 U.S. 78, 84 (1987); *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989)).  Moreover, courts must "accord *substantial deference* to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (emphasis added).

legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987) (emphasis added); *Gee v. Pacheco*, 627 F.3d 1178, 1187 (10th Cir. 2010) (same).

      1.   *Turner* Factors

      In determining whether a prison regulation is "reasonably related to legitimate penological interests," courts are "guided by four factors."  *Jones v. Salt Lake County*, 503 F.3d 1147, 1153 (10th Cir. 2007) (quoting *Turner*, 482 U.S. at 89).  Specifically, courts must consider "(1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest, (2) whether alternative means of exercising the constitutional right remain available to inmates, (3) any effect accommodating the right would have on guards and inmates, and (4) the absence of ready alternatives."  *Jacklovich*, 392 F.3d at 426 (citing *Turner*, 482 U.S. at 89-90, and referring to these criteria as the "*Turner* factors").  The Tenth Circuit has delineated additional standards that correspond respectively to each of the four *Turner* factors:

> [1] The legitimate governmental objective must also be neutral.  A regulation restricting an inmate's First Amendment rights must operate without regard to the content of the expression.  Where a regulation furthers an important or substantial government interest unrelated to the suppression of expression, the neutrality requirement is met.  In other words, where prison officials draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are "neutral."
>
> [2] The right in question must be viewed sensibly and expansively.  Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation.  The alternatives need not be ideal; they need only be available. …
>
> [3] When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.
>
> [4] [Courts are to] determine whether obvious, easy alternatives exist that fully accommodate inmates' rights at *de minimis* cost to valid penological interests.  If so, the regulation may not be reasonable but an "exaggerated response" to prison concerns.  However, this is not a "least restrictive alternative" test: prison officials

do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. Nevertheless, if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Jones*, 503 F.3d at 1153 (quotation marks and brackets omitted) (citing *Turner*, 482 U.S. at 89-91;

*Thornburgh v. Abbott*, 490 U.S. 401, 415-18 (1989); *Wardell v. Maggard*, 470 F.3d 954, 961-62

(10th Cir. 2006)).

The *Turner* factors "require[] courts, on a case-by-case basis, to look closely at the facts of

a particular case and the specific regulations and interests of the prison system in determining

whether [a] prisoners' constitutional rights may be curtailed." *Wardell*, 470 F.3d at 961 (quoting

*Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002)). Furthermore, although these factors

require prison officials to "show more than a formalistic logical connection between a regulation

and a penological objective," *Beard v. Banks*, 548 U.S. 521, 535 (2006), ultimately "[t]he burden

… is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."

*Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

2. Applying the *Turner* Factors

In applying the *Turner* factors, the Tenth Circuit has "impli[ed]" that "a *complete ban*" on

paperback books for inmates "would likely violate the First Amendment." *Khan v. Barela*, 808

Fed. Appx. 602, 608 (10th Cir. 2020) (unpublished) (emphasis added) (citing *Wolfish*, 441 U.S.

520; *Jones*, 503 F.3d 1147); *see also id.* (concluding that "for pleading purposes, [the inmate] ha[d]

done enough by alleging the existence of a *blanket ban* [on hardcover books or newspapers] that

could be reasonably construed as an intent to punish rather than as a reasonable response to a

legitimate penological concern" (emphasis added)).[14]

---

[14] In addition, the Tenth Circuit has found genuine issues of material fact as to whether Kansas Department of Corrections' policies were "reasonably related to [defendants' asserted] legitimate penological interests" of "*security*

The Tenth Circuit, however, has upheld a policy in which "[a] County Jail prohibit[ed] inmates from … ordering paperback books from the outside" but nevertheless still permitted inmates to (1) "obtain paperback books through the jail library, which contain[ed] thousands of books," and (2) "seek permission to order a paperback book from a publisher" if the request was "reasonable" and consistent with "the jail's safety and security needs." *Jones*, 503 F.3d at 1156-57.  In doing so, the Tenth Circuit applied the *Turner* factors and concluded that this "'publishers only' rule with regard to paperback books," *Khan*, 808 Fed. Appx. at 608, was "rationally related to the legitimate governmental objective of prison security" and thus constitutional:

> [First,] [a]llowing inmates to purchase paperback books only from the publisher prevents contraband from being smuggled into the jail and lessens the administrative burden on jail personnel who must inspect each book.  [Second,] [i]nmates also have alternative means of obtaining reading material because they can obtain books from the jail library and are permitted to have newspapers and certain magazines. … [Third,] [t]o allow inmates to possess paperback books from non-publishers would have a significant impact on jail resources.  [Fourth,] [there was] no indication the policy [was] an "exaggerated response" to the jail's concerns.

*Jones*, 503 F.3d at 1158-59; *see also Wolfish*, 441 U.S. at 549-50 (upholding a similar policy with respect to hardcover books); *Khan*, 808 Fed. Appx. at 608 (observing that Courts in *Wolfish* and *Jones* upheld "similar 'publishers only' rule[s]" against First Amendment challenges for identical reasons—the rules "prevented contraband from being smuggled into the jail and lessened the

---

*and behavior management*" when those policies (1) "prohibit[ed] the receipt of *all* gift publications" (i.e., publications "paid for by anyone other than the vendor"); (2) involved a "*complete ban* on publications (other than a primary religious text) for [Level I] inmates" that applied "regardless of behavior"; and (3) a "$30 monthly limit on publications" that inmates could purchase.  *Jacklovich*, 392 F.3d at 422-25, 428-32 (emphasis added); *see also id.* at 426-32 (applying the *Turner* factors and discussing the items that created a genuine factual dispute—including (1) expert testimony that such policies "serve no legitimate penological purpose (and may undermine rehabilitation), result in greater work for prison staff, are unique among jurisdictions and are unsupported by any empirical data;" (2) evidence that the magazine "Prison Legal News [was] not available" in the prison library as an alternative means of accessing this publication (outside of a prohibited gift subscription or a prohibited inmate expenditure above the $30 limit); (3) the lack of evidence of a link between improved *behavior management* and either the $30 limit or the Level I ban (which applied based on an inmate's status, not behavior); (4) the lack of evidence of a link between greater *security* and the gift publication ban; and (5) the lack of evidence that increasing the $30 limit, allowing gift subscriptions, or implementing a "special purchase order" alternative would have more than a minimal effect on prison operations).

administrative burden to search [the] books"); *Whitehead v. Mgmt. & Training Corp.*, Civ. No. 17-275 MV/KK, 524 F. Supp. 3d 1155, 1176-83 (D.N.M. Mar. 1, 2021), *appeal docketed*, No. 21-2029 (10th Cir. Mar. 31, 2021) (addressing an OCPF inmate's First Amendment challenge to "restricti[ons] [on] his access to publications from non-approved vendors"—and, in granting summary judgment in defendants' favor, concluding that "each *Turner* factor support[ed] the constitutional validity of the challenged restrictions").

### D.  Fourteenth Amendment Rights to Due Process and Equal Protection

The Fourteenth Amendment provides that "No State shall … deprive any person of life, liberty, or property, without due process of law; law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

Due process "requires compliance with fair procedures when the government deprives an individual of certain … 'property' interests.  *Kerry v. Din*, 576 U.S. 86, 107-08 (2015) (citation omitted).  "While an inmate's ownership of property is a protected property interest that may not be infringed without due process, there is a difference between the right to own property and the right to possess property while in prison."  *Hatten v. White*, 275 F.3d 1208, 1210 (10th Cir. 2002).  Thus, if a prisoner was given the opportunity to "send the property he could not possess in prison to a place of his choosing," *id.*, then he has not been "unlawfully deprived of his property."  *Sperry v. Wildermuth*, CASE NO. 16-3222-SAC, 2020 U.S. Dist. LEXIS 244353, 2020 WL 7770932, at *10 (D. Kan. Dec. 30, 2020) (citing *Hatten*, 275 F.3d at 1210).  Furthermore, a prison does not "violate [an inmate's] constitutional right to due process" when it (1) "provide[s] [him] a meaningful opportunity to decide the fate of his own property" and (2) "act[s] reasonably" in

disposing of the property when that inmate fails to "dictate where his property should go." *Searcy v. Simmons*, 299 F.3d 1220, 1229 (10th Cir. 2002).[15]

Equal protection "requires that no state deny any person within its jurisdiction the equal protection of the laws." *Penrod v. Zavaras*, 94 F.3d 1399 (10th Cir. 1996). "[It] is essentially a direction that all persons *similarly situated* should be treated alike." *Trujillo v. Williams*, 465 F.3d 1210, 1228 (10th Cir. 2006) (emphasis in original) (quoting *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 659 (10th Cir. 2006)). If an inmate "'does not claim that [prison officials] treated him differently because of any suspect classification,' [then] to prevail on [an] equal protection claim he would have to prove that 'the distinction between himself and other inmates was not reasonably related to some legitimate penological purpose.'" *Id.* (quoting *Templeman v. Gunter*, 16 F.3d 367, 371 (10th Cir. 1994)); *Turner*, 482 U.S. at 89; *see also Edwards v. Valdez*, 789 F.2d 1477 (10th Cir. 1986) (observing that "[s]uspect classifications generally include those based on race, alienage, and national origin"). And an inmate bears a "heavy burden" in establishing an unreasonable relationship to a penological purpose, as he must "overcome [the] presumption of government rationality." *Trujillo*, 465 F.3d at 1228 (quoting *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995)).

Finally, a prisoner cannot successfully bring "due process … [or] equal protection claims relating to [prison officials'] failure to answer his grievances." *Gray v. Geo Grp., Inc.*, 727 Fed. Appx. 940, 948 (10th Cir. 2018) (unpublished). And a court may "properly dismiss[]" such claims because "there is no independent constitutional right to state administrative grievance procedures."

---

[15] *See also id.* (observing that "it was entirely proper for the prison authorities to dispatch [the inmate's] property in the manner they did" and that "[i]ndeed, the federal prison regulations provide for similar disposal of [prohibited items]"); 28 C.F.R. § 553.13(b)(2)(iii) ("Where the inmate has established ownership … but … refuses to provide a mailing address for return of the property, the property is to be disposed of through approved methods, *including destruction of the property*." (emphasis added)).

*Id.* (citing *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994); *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (per curiam)); *Boyd v. Werholtz*, 443 Fed. Appx. 331, 332 (10th Cir. 2011) (same).  In addition, "the state's voluntary provision of an administrative grievance process" does not "create a liberty interest in that process."  *Id.*  Thus, "[w]hen the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by [a] prison's refusal to entertain his grievance."  *Gray*, 727 Fed. Appx. at 948 (quoting *Flick*, 932 F.2d at 729).[16]

## V.  DISCUSSION

For the reasons set forth below, the Court holds that Defendants did not violate Plaintiff's constitutional rights and are entitled to summary judgment on Plaintiff's claims because (1) Defendants' approved vendor policy was constitutional, (2) Defendants lawfully deprived Plaintiff of his book, and (3) Defendants treated Plaintiff the same as other similarly situated inmates.

### A.  Defendants' Approved Vendor Policy Was Constitutional

In applying the four *Turner* factors and drawing all reasonable inferences in Plaintiff's favor, the Court holds that Defendants' approved vendor policy was "reasonably related to legitimate penological interests" and therefore constitutional.  *Jones*, 503 F.3d at 1153, 1156-59.

First, the Court finds that "a *valid and rational* connection exists between the [approved vendor policy] and the asserted legitimate governmental interest," *Jacklovich*, 392 F.3d at 426 (emphasis added), of "security and resource management," Mot. 19.  Indeed, "[a]llowing inmates to purchase paperback books only from [an approved vendor] prevents contraband from being smuggled into [OCPF] and lessens the administrative burden on [OCPF] personnel who must

---

[16] *See also Boyd*, 443 Fed. Appx. at 331-32 (upholding the dismissal of an inmate's claim regarding an "alleged deprivation of a prison grievance process" because "any alleged deprivation of the prison grievance process … failed to implicate [the inmate's] right of access to the courts").

inspect each book." *Jones*, 503 F.3d at 1153.  And Defendants have presented uncontroverted evidence to this effect.  *Compare* Mot. ¶¶ 10, 13, 18-23, 25-16, 26-27 (citing evidence from Warden Martinez that the policy served to alleviate security concerns regarding the smuggling of contraband—and did so without overburdening prison resources), *with* ECFs 47-49 (Plaintiff's response filing containing no specific refutations of such evidence).[17]  Furthermore, Defendants' policy and its "legitimate governmental objective[s]" of security and resource management are "neutral." *Jones*, 503 F.3d at 1153.  In other words, the policy "draw[s] distinctions between publications solely on the basis of their potential implications for prison security"—i.e., the distinctions are "without regard to the content" of the publications.  *Id.*; *see* Mot. ¶¶ 10, 13, 18-23, 25-16, 26-27; ECFs 47-49.  Consequently, there is a "valid and rational connection" between OCPF's approved vendor policy and OCPF's interest in effectively preventing contraband from entering the prison.[18]

Second, the Court finds that Plaintiff has not pointed to admissible evidence that would call into question that "alternative means of exercising the constitutional right [to receive information] remain[ed] available to inmates." *Jacklovich*, 392 F.3d at 426.  Defendants have presented uncontroverted evidence that OCPF inmates in 2016 had access to a broad range of publications, including from OCPF's libraries, the inter-library loan system, and "OCPF's

---

[17] *See also Sperry v. Werholtz*, 413 Fed. Appx. 31, 40 (10th Cir. 2011) (unpublished) (observing that "[t]o show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove that the banned materials actually caused problems in the past, or that the materials are likely to cause problems in the future. In other words, empirical evidence is not necessarily required.  Moreover, it does not matter whether [the courts] agree with the defendants or whether the policy in fact advances the jail's legitimate interests.  The only question that [courts] must answer is whether the defendants' judgment was rational, that is, whether the defendants might reasonably have thought that the policy would advance its interests.").

[18] *See also Whitehead*, 524 F. Supp. 3d at 1179 (observing "an obvious connection between [a] prison's approved vendor policy and the governmental interest in preventing contraband from entering the prison" (quoting *Payne v. Friel*, No. 2:04-CV-844-DAK, 2007 U.S. Dist. LEXIS 26617, 2007 WL 1100420, at *8 (D. Utah Apr. 10, 2007), *aff'd in relevant part*, 266 Fed. Appx. 724 (10th Cir. 2008))).

extensive list of approved vendors [such as Barnes and Noble and Amazon], which provided over a million book titles." Mot. ¶¶ 14, 28-32 (quoting Martinez affidavit); *see* ECFs 47-49 (Plaintiff's response filings containing no specific refutations of such evidence). Thus, because "other avenues remain available for the exercise of [Plaintiff's] asserted right [to receive information], [this Court] should be particularly conscious of the measure of judicial deference owed to [OCPF] corrections officials." *Jones*, 503 F.3d at 1153; *see also id.* (observing that "[t]he alternatives need not be ideal; they need only be available"); *Whitehead*, 524 F. Supp. 3d at 1180 (reasoning that "'the right' at issue … was not [an OCPF inmate's] right to have access to any book he wanted—but "[r]ather, 'viewed sensibly and expansively,' it was to have access to 'a broad range of publications,' which [the inmate] indisputably did" (quoting *Thornburgh*, 490 U.S. at 417-18)). Although Plaintiff may have preferred receiving some information through certain means—i.e., by personally possessing a book that was shipped from a non-approved vendor—he indisputably had "alternative means" of receiving information.[19]

Third, the Court finds that Plaintiff has pointed to no admissible evidence that would call into question that "allow[ing] inmates to possess paperback books from non-[approved vendors] would have a significant impact on jail resources." *Jones*, 503 F.3d at 1159. Indeed, Defendants presented evidence that allowing non-approved vendors in 2016 to ship books directly to inmates would have unduly "increased [the] administrative burden involved in checking each book for contraband"—including by creating "the need to hire additional staff or purchase additional screening equipment such as metal/drug detectors," and "ma[king] it difficult if not impossible to

---

[19] Although not necessary to its finding of an alternative means of receiving information, the Court observes that had Plaintiff—at any point in the last five-and-a-half years—sought out a copy of the aforementioned paperback book at a prison library (including the inter-library loan system), he would have discovered an *additional* alternative means of obtaining the information conveyed in this book: checking the book out from the library. *See* Mot. ¶ 35; ECF 49 at 10-11.

comply with [the required] time constraints" for holding inmates' mail and packages.  Mot. ¶¶ 19-22, 27 (quoting Martinez affidavit); *see* ECFs 47-49 (Plaintiff's response filings containing no specific refutations of such evidence).  Consequently, because "accommodation of [Plaintiff's] asserted right" would have had "a significant ripple effect on … prison staff," the Court "should be particularly deferential to the informed discretion of [OCPF] corrections official" regarding OCPF's approved vendor policy that was in place at the time.  *Jones*, 503 F.3d at 1153.

Fourth, there is "no indication the policy [was] an 'exaggerated response' to the [OCPF's] concerns."  *Jones*, 503 F.3d at 1159.  For instance, the record contains no evidence that, during the applicable 2016 timeframe, some "*obvious*, *easy* alternatives exist[ed] that *fully* accommodate[d] inmates' rights [to receive paperback books from any vendor of their choice] at *de minimis* cost to [the] valid penological interests" of security and resource management at OCPF.  *Jones*, 503 F.3d at 1153 (emphasis added); *see* ECFs 43-45, 47-49.  To be sure, OCPF later made changes to its policy (in late 2016 and mid-2017) that allowed items to be received "directly from the publisher or vendor," Mot. ¶¶ 16-17.  But "[t]hat Defendants gradually instituted more lenient approved vendor restrictions at the OCPF does not show that these restrictions imposed *de minimis* costs on OCPF at all, much less that they would have done so under the circumstances prevailing when the original restrictions were in effect."  *Whitehead*, 524 F. Supp. 3d at 1182; *see also id.* at 1182 n. 20 ("not[ing] that, if [courts] were to treat a prison's decision to relax a restriction as evidence that the original restriction was unconstitutional, this could discourage prisons from modifying their regulations to provide prisoners with greater freedoms").

In sum, the Court holds that there is no genuine dispute of material fact that Defendants' approved vendor policy was "reasonably related to legitimate penological interests."  *Turner*, 482 U.S. at 89.  Therefore, "[Defendants'] policy [was] constitutional," and Defendants are entitled to

"judgment as a matter of law" on Plaintiff's First Amendment claims.  *Jones*, 503 F.3d at 1153, 1156-59, 1163 (quoting Fed. R. Civ. P. 56(c)).

## B.  Defendants Lawfully Deprived Plaintiff of the Book

Even drawing all reasonable inferences in favor of Plaintiff, the Court holds that Plaintiff has pointed to no admissible evidence that would call into question that he was lawfully deprived of his book.  As mentioned, it is undisputed that Defendants (1) gave Plaintiff the opportunity to send his book to a place of his choosing and then (2) placed the book in the library when Plaintiff failed to decide where the book should go.  *Compare* Mot. ¶¶ 34-35 (citing Martinez affidavit and notification informing Plaintiff of his options), *with* ECFs 47-49 (Plaintiff's response filing containing no specific refutations of such evidence).  Consequently, OCPF did not "violate [Plaintiff's] constitutional right to due process" because it (1) "provided [him] a meaningful opportunity to decide the fate of his own property" and (2) "acted reasonably" in disposing of the property by placing it in the library when he failed to "dictate where his property should go." *Searcy*, 299 F.3d at 1229; *see also Hatten*, 275 F.3d at 1210 (providing that, because an inmate was "allowed to send the property he could not possess in prison to a place of his choosing," he was not unlawfully "deprived of the property").[20]  In other words, "it was entirely proper for the prison authorities to [dispose of] [Plaintiff's] property in the manner they did." *Searcy*, 299 F.3d at 1229.

Plaintiff spends considerable effort arguing that Defendants violated his due process rights by depriving him of his book without following a certain procedure: forwarding his grievance appeal to the "Cabinet Secretary/Designee."  *See* ECFs 22 at 21-23, 26, 28-29, 31-32, 35; 47 at 2-

---

[20] Although Defendants could have completely destroyed the book because Plaintiff declined to decide where it should go, Mot. ¶ 34; ECF 49 at 10, they nevertheless reasonably opted for something less severe—an option that still gave Plaintiff access to the book (without requiring Defendants to overhaul their approved vendor policy for all inmates). Mot. ¶ 35; ECF 49 at 11.

4, 6-8, 14-19; 48 at ¶ 5; 49 at 3-4, 6-10.  But "there is no independent constitutional right to state administrative grievance procedures." *Gray*, 727 Fed. Appx. at 948; *Boyd*, 443 Fed. Appx. at 332. And even if there were some sort of "deprivation of a prison grievance process," any such deprivation would not have "implicate[d] [Plaintiff's] right of access to the courts." *Boyd*, 443 Fed. Appx. at 331-32; *see also Gray*, 727 Fed. Appx. at 948 (observing that "[w]hen the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by [a] prison's refusal to entertain his grievance").  ECFs 22 at 11, 38-39; 48 at ¶¶ 3-5; 49 at 3-4 (showing that Plaintiff's grievance concerned his First Amendment rights in connection with the denial of the opportunity to possess the book).  Consequently, Plaintiff cannot succeed in any "due process … claims relating to [OCPF officials'] failure to [properly address] his grievances." *Gray.*, 727 Fed. Appx. at 948.

In sum, there is no genuine dispute of material fact regarding Plaintiff's due process claim, and Defendants are entitled to judgment as a matter of law on that claim.

### C.  Defendants Treated Plaintiff the Same as Similarly Situated Inmates

Plaintiff claims that Defendant violated his equal protection rights by treating him differently—by allowing other similarly situated inmates to receive books from non-approved vendors in early 2016.  ECF 22 at 24, 26-27, 30, 35; *see also* ECFs 47 at 9; 48 at 2; 49 at 14.  In disputing this claim, Defendants have met their "initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Libertarian Party*, 506 F.3d at 1309.  Specifically, they have presented evidence from Warden Martinez that Plaintiff was "treated the same as any other inmate at OCPF with

respect to the application of [OCPF's approved vendor policy]." *Id.* at ¶ 40 (quoting Martinez affidavit).

Because Defendants have "[met] this initial burden," *Libertarian Party*, 506 F.3d at 1309, Plaintiff has the burden to "designate *specific* facts" that (1) are "admissible in evidence," *Janny*, 8 F.4th at 899-900; and (2) permit "a rational trier of fact [to] find for [Plaintiff]," *Libertarian Party*, 506 F.3d at 1309. As mentioned, Plaintiff has presented what purports to be some sort of printout from January 2016 online order confirmation from Prison Legal News, the book's vendor and publisher. ECF 47 at 2. But even "view[ing] the facts and draw[ing] reasonable inferences in the light most favorable to [Plaintiff]," *Scott*, 550 U. S. at 378 (quotation omitted), the Court concludes that such evidence does not create a "*genuine* dispute" of material fact. Fed. R. Civ. P. 56(a) (emphasis added).

To be sure, the Court assumes without deciding that this document is admissible in evidence—e.g., that it is both authenticated[21] and a business record hearsay exception.[22] Even if it were admissible, however, and a rational trier of fact viewed the document's information and statements as true, the document—at most—establishes that a book was purchased and "awaiting shipping" to an inmate at OCPF. ECF 27 at 22. But even further assuming that such a book was indeed shipped, and then inspected by OCPF officials, the document provides *no* evidence about what OCPF officials would have done with the book. *Cf.* ECF 22 at 37 (the "sales receipt," with

---

[21] *See* Fed. R. Evid. 901 (requiring the proponent of the evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is").

[22] *See* Fed. R. Evid. 803(6) (requiring that a record custodian or "another qualified witness" testify that the record (1) was made pursuant to "a regular practice" of the business, (2) was made "at or near the time [of the event] by … someone with knowledge," (3) was "kept in the course of a regularly conducted activity of a business," and (4) does not "indicate a lack of trustworthiness," either due to its "method or circumstances of preparation" or information provided by "the opponent" of the evidence); *see also Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995) (observing that, although "the nonmoving party need not produce evidence 'in a *form* that would be admissible at trial,'" the "content or substance of the evidence must be admissible" (emphasis in original) (quoting *Celotex*, 477 U.S. at 324)).

accompanying shipping label, provided by Plaintiff for the paperback book that he ordered—but was not permitted to personally possess).  Thus, Plaintiff has not met his burden to "designate *specific* facts," *Janny*, 8 F.4th at 899-900, from which "a rational trier of fact," *Libertarian Party*, 506 F.3d at 1309, could find that OCPF official treated him differently than other similarly situated inmates (and without some reasonable relationship to a "legitimate penological purpose").  *See Trujillo*, 465 F.3d at 1228.  The Court therefore "consider[s] the [following] fact undisputed for purposes of the [M]otion," Fed. R. Civ. P. 56(e): that Plaintiff was "treated the same as any other inmate at OCPF with respect to the application of [OCPF's approved vendor policy]."  Mot. ¶ 40 (quoting Martinez affidavit).

Consequently, the Court holds that there is no genuine dispute that OCPF did not apply its approved vendor policy in a manner that treated Plaintiff differently than other similarly situated inmates.  Defendants are therefore entitled to judgment as a matter of law on Plaintiff's equal protection claim.

## VI.  CONCLUSION

For the foregoing reasons, the Court holds that Defendants did not violate Plaintiff's constitutional rights and are entitled to summary judgment on Plaintiff's claims

**IT IS THEREFORE RECOMMENDED** that Defendants' Motion be **GRANTED** and Plaintiff's Amended Complaint [ECF 22] and this case be **DISMISSED WITH PREJUDICE**.

**SO RECOMMENDED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1)(c). Any request for an extension must be filed in writing no later than seven days from the date of this filing. **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed**.